12 CV 5100

ANDREW M. CALAMARI
ACTING REGIONAL DIRECTOR
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Aaron P. Arnzen
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

        - against -

PETER B. MADOFF,

                    Defendant.

------------------------------------------------------------x

__ Civ. ___

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Peter B. Madoff ("Peter, or "Defendant"), alleges:

## SUMMARY

1.     Peter Madoff, Bernard Madoff's ("Madoff") younger brother, was Bernard L. Madoff Investment Securities LLC's ("BMIS") Senior Managing Director and Chief Compliance Officer ("CCO") from 1969 through December 11, 2008. Peter was responsible for catastrophic compliance failures in these roles even while he created the

illusory (albeit convincing) façade of a functioning compliance program that allowed Madoff and BMIS to carry out a decades-long Ponzi scheme.

2.      Peter was responsible for supervising BMIS's market-making and proprietary trading operations (the "MM & PT Operations"), which are not the subjects of this action.  Madoff also enlisted Peter's help in several illicit projects concerning BMIS's investment advisory operations (the "IA Operations"), through which Madoff orchestrated his Ponzi scheme.

3.      Peter created stacks of documents, for example, purporting to demonstrate that a functioning compliance program was in place over the IA Operations.  Peter routinely created and revised policies and procedures manuals, checklists, and narratives, and drafted reports documenting comprehensive compliance reviews that Peter himself supposedly helped to carry out.  As Peter knew at the time, however, these documents were all show and no substance – Peter failed to implement any such policies or procedures in the IA Operations and never conducted any such reviews.

4.      Peter was also intricately involved in creating and filing with the Commission BMIS's investment adviser registration application on Form ADV, which contained a number of material misrepresentations.  At Madoff's direction, Peter knowingly falsified information on the Form ADV by, among other things, grossly understating the number of Madoff's clients and amount of assets under management, overstating compliance oversight of the IA Operations, and misrepresenting that third parties did not solicit clients on behalf of BMIS.  The Form ADV represented that Peter acted as CCO over the IA Operations, which was also false because Peter, in fact, exercised no compliance authority in this area.

5.     Peter's misconduct continued right up until the Ponzi scheme's final days. Shortly before BMIS imploded on December 11, 2008, Madoff told Peter that there were insufficient funds to pay investor redemption requests, but that he, Madoff, intended to distribute any remaining investor funds to family and friends before BMIS's final collapse.  Peter then helped decide who should benefit from Madoff's favoritism and receive what was left of the customer/client funds.  Even while that process was under way, Peter rushed to withdraw approximately $200,000 for himself from BMIS's bank account.

6.     Peter was handsomely rewarded for his misconduct.  He received tens of millions of dollars in ill-gotten gains, including salary and bonuses, proceeds from fake securities trades in his own BMIS customer/client account that were backdated by over a year, sham loan transactions, and direct, undocumented transfers to Peter from the main bank account that BMIS used in the Ponzi scheme.  Peter used these fraudulent proceeds to support a luxurious lifestyle at the expense of BMIS's customers/clients.

## VIOLATIONS

7.     By virtue of the conduct alleged herein, Defendant directly or indirectly, singly or in concert, has engaged in acts, practices, schemes and courses of business that violated and aided and abetted violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 207 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-7]; and aided and abetted violations of Sections 15(b)(1), 15(c) and 17(a) of the Exchange Act [15 U.S.C. §§ 78o(b)(1), 78o(c), 78q(a)] and Rules 10b-3, 15b3-1 and 17a-3 thereunder [17 C.F.R. §§ 240.10b-3, 240.15b3-1, 240.17a-3], and Sections 204, 206(1),

206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(l), (2) and (4), 80b-7];

and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2, 275.206(4)-7].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred

upon it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section

209(d) of the Advisers Act [15 U.S.C. § 80b-9(e)], seeking to restrain and enjoin

permanently Defendant from engaging in the acts, practices and courses of business

alleged herein.

9.      In addition to the injunctive relief recited above, the Commission seeks: (i)

a final judgment ordering Defendant to disgorge his ill-gotten gains with prejudgment

interest thereon; (ii) a final judgment ordering Defendant to pay civil penalties pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)]; and (iii) such other relief as the Court deems just and

appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Sections 21(e) and

27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers

Act [15 U.S.C. § 80b-14].

11.      Venue is proper in the Southern District of New York pursuant to 28

U.S.C. § 1391.  The Defendant, directly or indirectly, has made use of the means and

instrumentalities of interstate commerce, or of the mails and wires, in connection with the

transactions, acts, practices and courses of business alleged herein.  A substantial part of

the events comprising Defendant's unlawful activities giving rise to the Commission's

claims occurred in this District, and Defendant committed his unlawful activities while

working in a business office in this District.

## THE DEFENDANT

12.     **Peter Madoff**, age 66, is Bernard Madoff's brother, a long-time BMIS

employee, and an attorney.  Peter graduated from Queens College in 1965 and from

Fordham Law School in 1969.  After graduating from law school, Peter became the firm's

CCO and Senior Managing Director.  Peter was also the lead trader in BMIS's MM & PT

Operations for a significant period of time.  Peter became a director of BMIS's London

affiliate, Madoff Securities International Ltd., when it was established in 1983.  He has

held several securities licenses, including Series 1 (general securities representative),

Series 4 (options), and Series 55 (equity trader).  He has also held a number of leadership

positions in the securities industry, including Vice-Chairman of the National Association

of Securities Dealers, Inc. ("NASD"), Chairman of the NASD Trading Committee,

Chairman of the NASD District 10 Business Conduct Committee, Member of the NASD

Executive Committee, Governor of the Cincinnati Stock Exchange, President of the

Security Traders Association of New York ("STANY"), Chairman of the STANY Options

Committee and of STANY's Trading Committee, and Director of the National Securities

Clearing Corporation.

## RELEVANT INDIVIDUALS AND ENTITIES

13.     **Madoff**, age 74, was, until 2009, a resident of New York City and the sole

owner of BMIS.  Until December 11, 2008, Madoff, a former chairman of the board of

directors of the NASDAQ stock market, oversaw and controlled the fraudulent IA

Operations at BMIS as well as the firm's overall finances.  Civil and criminal charges

were brought against Madoff for his role in a multi-billion dollar Ponzi scheme. See S.E.C. v. Bernard L. Madoff and Bernard L. Madoff Investment Securities LLC, No. 08-CV-10791 (S.D.N.Y.) (LLS) (the "Civil Action") and United States v. Bernard L. Madoff, No. 09 Cr. 213 (S.D.N.Y.) (DC) (the "Criminal Action"). On February 9, 2009, in the Civil Action against Madoff, the District Court, with Madoff's consent, entered a partial judgment in the Commission's case against Madoff. On March 12, 2009, Madoff pleaded guilty to eleven felony counts in the Criminal Action against him. In his allocution, Madoff admitted that he orchestrated the massive Ponzi scheme that is a subject of the present charges. On June 29, 2009, Madoff was sentenced to 150 years in prison and ordered to forfeit his assets. Madoff is currently incarcerated in a federal prison in North Carolina.

14.    **BMIS** registered with the Commission as a broker-dealer in 1960 and as an investment adviser in August 2006, and had its principal place of business in New York, New York. BMIS purportedly engaged in three different operations – investment advisory operations, market-making, and proprietary trading. BMIS is currently under the control of a trustee appointed pursuant to the Securities Investor Protection Act of 1970 (15 U.S.C. § 78aaa et seq.).

## FACTS

### I.    BMIS's Investment Advisory Accounts and the Ponzi Scheme

15.    For decades, Madoff and others orchestrated a massive Ponzi scheme through BMIS's IA Operations. Madoff solicited funds from direct investors and feeder funds by promising to invest those funds in equity securities and hedge the related downside risk, and thereby make certain rates of return.

16.   In fact, however, neither Madoff nor BMIS invested these funds in the manner described.  Instead, Madoff directed that investor funds be kept in highly liquid form, including cash, certificates of deposit, and treasury bills.  A large portion of these funds were used to pay investor redemption requests and to line Madoff's pockets and the pockets of those around him.

17.   In addition to the IA Operations, Madoff ran the MM & PT Operations out of BMIS.  Peter was active in overseeing the MM & PT Operations, and also involved himself in certain projects related to the IA Operations on an episodic, as-needed basis. When Peter did get involved with the IA Operations, it usually resulted in some form of misconduct.

## II.   Peter Madoff's Roles and Responsibilities

18.   As Senior Managing Director, Peter was second in command at BMIS and had overarching responsibilities with respect to most aspects of the firm.  Peter supervised trading, systems and IT personnel; created and reviewed the firm's quarterly and annual budgets; and handled personnel matters including hiring, firing, discipline, salary and bonuses.  Peter was designated as CCO over the entire firm in 1969, and specifically over the IA Operations in 2006.

19.   Peter stayed abreast of statutes and regulations pertinent to BMIS's MM & PT Operations and, particularly from mid-2006 through 2008, the IA Operations.  Peter also supervised the creation of a voluminous body of documents setting out policies and procedures applicable to the entire firm, and documented purported compliance reviews of the business.

20.     Peter was also intricately involved in creating BMIS's investment adviser registration application on Form ADV, and oversaw the completion and filing of BMIS's broker-dealer registration application and amendments thereto on Form BD.

21.     As alleged in more detail below, in carrying out his duties, Peter knowingly or recklessly assisted in the creation of false Forms ADV, False Forms BD, and false compliance materials. Peter also distributed client funds to himself and his and Madoff's family and friends after Madoff told Peter that his scheme was collapsing.

### III.    Peter Created the False Appearance of a Functioning Compliance Program over the IA Operations.

22.     Madoff was acutely aware that investors and regulators placed a great deal of emphasis on effective compliance programs over customer/client accounts. At Madoff's instruction, Peter helped create the convincing appearance of a comprehensive compliance program over BMIS's IA Operations.

23.     Peter repeatedly held himself out as CCO at BMIS. He was designated as such on the firm's Forms ADV and Forms BD. Peter was also identified as CCO during Commission and FINRA examinations, and in statements made directly to investor representatives.

24.     Further, Peter and his compliance staff prepared stacks of documents purporting to evidence a detailed compliance program in the form of compliance manuals, written supervisory procedures, and reports of annual and interim reviews of policies and procedures.

### A.    Policies and Procedures Applicable to the IA Operations

25.     Peter and his staff designed policies and procedures that applied to the entire firm, including the IA Operations. In several compliance documents, Peter and

8

Madoff were both listed as "principals responsible for establishing policies and procedures that are reasonably designed to ensure compliance with any applicable federal requirements or rules of a self-regulatory organization."

26.     Similarly, Peter was responsible for "mapping" BMIS's entire business in order to develop appropriate policies and procedures.  One internal report stated that Peter "conducted a detailed review of each written supervisory procedure contained in Madoff's Written Supervisory Compliance Procedures. ... As part of the Firm's review, the applicable regulations of the SEC and NASD were identified and mapped to the Firm's business activities and processes."

27.     These policies and procedures, which purportedly applied to the entire firm, called for the following procedures:

a.  A "review [of] SEC, SRO [Self Regulatory Organization] Releases for timely communication to Supervisory, Systems, and Trading Personnel." "Supervisor: Peter Madoff."

b.  A review of "[e]mployee's 'Private Securities Transactions.'" "Supervisor: Peter Madoff."

c.  A process to "comply with the requirement that a designated principal will establish, maintain, and enforce supervisory control procedures that will test and verify that the firm's supervisory procedures are sufficient." "Supervisor: Peter Madoff."

d.  A "review of Madoff's customer account activity," including the "[t]ransmittal of funds or securities." Peter was designated as responsible for ensuring that a principal or independent person perform the review.

e.  A review of the trade blotter for "unusual patterns of trading activity." At least one version of this document designates Peter as a supervisor for purposes of this review.

f.  Anti-money laundering procedures.  Peter is listed as a supervisor for purposes of this review.

g.  A review of options activity, including steps to "[r]eview trading blotter" and "customer account records."  Peter and Madoff were designated as supervisors for purposes of this review.

28.   In addition to these firm-wide policies and procedures, Peter also oversaw an effort to put in place policies and procedures specifically applicable to the IA Operations.  The resulting investment adviser compliance manual stated that "BLMIS's supervisory personnel are Bernard L. Madoff and Peter B. Madoff," and that "BLMIS has designated Peter Madoff … as the Chief Compliance Officer to administer BLMIS's compliance policies and procedures in connection with its investment advisory business." Like the firm-wide policies and procedures alleged above, the investment adviser compliance manual and related documents stated that Peter was responsible for conducting a number of detailed procedures with respect to the IA Operations, including:

a.  Reviewing "all client trades to ascertain that securities were not purchased on behalf of the Client in contravention of any investment restrictions."

b.  Pre-approving all securities trades by BMIS employees.

c.  Ensuring that BMIS filed with the Commission an accurate Form 13F, reporting all securities held by the firm.

**B.      Peter's Failure to Implement, Review, or Test**
**        Policies and Procedures in the IA Operations**

29.      Peter never implemented, reviewed or tested the policies and procedures over the IA Operations that he designed and documented.  Nor did Peter ever take the steps in relation to the IA Operations that he personally assigned to himself, as alleged above.

30.      Despite this lack of implementation or testing, Peter falsely documented periodic compliance reviews of the IA Operations.  In doing so, Peter used different pens with various ink colors so that the reviews would appear to have been completed at certain intervals, when in fact he completed the forms *en masse* without ever performing the actual review procedures.

31.      Madoff and Frank DiPascali, one of Madoff's key lieutenants in the IA Operations, showed documents concerning BMIS's purported compliance program, including compliance policies and procedures, to the Commission's staff during a 2005 examination of the firm, to FINRA examiners, and to client representatives who conducted reviews of "fraud and related operational risks" at BMIS in 2005 and 2008.

**C.      Peter's False Statements in Annual Review**
**        Reports regarding the IA Operations**

32.      Pursuant to Rule 206(4)-7 under the Advisers Act, advisers are required to "[r]eview, no less frequently than annually, the adequacy of the policies and procedures reasonably designed to prevent violation ... of the Act."  Peter and his staff documented two purported Rule 206(4)-7 reviews of the IA Operations.

33.      The first report covered the period from September 1, 2006 through April 1, 2007, and bore Peter's handwritten initials.  The second report covered May 1, 2007 through January 1, 2008, and was signed by both Madoff and Peter.

34.     Both reports stated, in relevant part:

a.   "This document constitutes [BMIS's] annual review of the firm's investment advisory compliance program during the preceding calendar months ... The firm's Chief Compliance Officer ("CCO"), Peter Madoff, performed the Adviser's annual review."

b.   "The review demonstrated that the firm's written policies and procedures are effectively utilized by the firm. ... Specifically, the CCO examined the process by which all trading is supervised and found that the implementation of the compliance procedures reflected good principles of management and control."

c.   "The CCO qualitatively tested the compliance procedures and supervisory reviews."

35.     These representations were false. Peter did not perform any such reviews, and his conclusions were imaginary.

36.     NASD Rules 3012 and 3013 are similar to Rule 206(4)-7 under the Advisors Act insofar as they require broker-dealers to create an annual report regarding the firm's "system of supervisory controls, [and a] summary of ... test results and significant identified exceptions." These NASD rules, and BMIS's corresponding Rule 3012/3013 reports, directly apply to the customer/client accounts managed by BMIS's IA Operations.

37.     Peter and his staff created two Rule 3012/3013 reports, one in December 2006 and the other in December 2007, which stated that BMIS's compliance processes and procedures had been implemented, tested, and deemed sufficient over the entire firm. The reports stated:

a. "[T]he Firm commenced a comprehensive review of its supervisory system in response to the existing and new regulations. The initiative included all aspects of Madoff's business. The Compliance Department coordinated and oversaw this review."

b. "As part of the Firm's review, the applicable securities regulations of the SEC and NASD were identified and mapped to the Firm's business activities and processes."

c. "Additionally, representatives of the Compliance Department, including Madoff's Chief Compliance Officer, conducted an annual 'needs analysis' considering Madoff's business activities, regulatory requirements and areas of emphasis, industry issues, and client base."

d. "Each of [BMIS's] tests concluded that the Firm's business practices and its written supervisory procedures are in compliance with applicable laws, rules and regulations."

e. In relation to customer account activity, BMIS's "establishment, maintenance, and enforcement of its written supervisory control policies and procedures include procedures reasonably designed to review and monitor all transmittals of funds or securities."

38.    Peter knew that the foregoing representations in the Rule 206(4)-7 and Rule 3012/3013 compliance review reports were false. The referenced policies and procedures over the IA Operations were never implemented, so any representation that the functioning of such policies and procedures were reviewed and tested is false. Similarly, the conclusion that BMIS's phantom implementation of its policies and procedures

"reflected good principals of management and control" is farcical.  In short, these purported reviews of the IA Operations never took place and the reports were simply created to paper the file and mislead investors and regulators.

**D.     False Statements to Customer/Clients regarding Compliance**

39.     Peter affirmatively made false statements to specific BMIS customer/clients, asserting that he functioned as CCO over the entire firm, and that the firm had in place a functioning compliance program.

40.     For example, a certain registered investment adviser ("Adviser A") arranged for two of its clients to invest in BMIS advisory accounts.  In 2006, Adviser A requested that BMIS sign an "Annual Compliance Certification" regarding its clients' BMIS accounts.

41.     BMIS produced to Adviser A the compliance certification, dated August 21, 2006, with Peter's signature.  BMIS produced another such certification to Adviser A the following year, also signed by Peter.

42.     In the compliance certifications, Peter specifically represented that BMIS "has in place a process to [a]dopt and implement policies and procedures reasonably designed to prevent violation of the federal securities laws and regulations; [r]eview and test the adequacy and effectiveness of such policies and procedures on a periodic basis, the timing of which is reasonably designed to ensure continuing compliance with federal securities laws and regulations, but no less than annually; and [d]esignate a Chief Compliance Officer to be responsible for administering such policies and procedures."

43.     As Peter knew or recklessly disregarded, the foregoing statements were false insofar as virtually no policies or procedures were implemented over the IA

Operations, no such policies or procedures were reviewed or tested for adequacy and effectiveness, and nobody acted as an effective CCO over the IA Operations.

44.     Based in part on these certifications, Adviser A continued to instruct BMIS to execute Madoff's purported trading strategy in its clients' advisory accounts, and BMIS reflected active securities trading in monthly statements for these accounts from August 2006 (when Peter signed the first certification) through the Ponzi scheme's collapse in December 2008.

## IV.   Peter Made, and Assisted in Making, Misrepresentations in BMIS's Investment Adviser Registration Application.

### A.     Background

45.     Prior to 2006, Madoff falsely asserted that his investors were broker-dealer customers, and not advisory clients, because BMIS purportedly exercised only limited discretion over transactions in customer/client accounts carried in the IA Operations. Madoff finally decided to register BMIS as an investment adviser in August 2006, and was therefore required to file with the Commission an initial application for investment adviser registration on Form ADV Part I.

46.     Peter, with assistance from BMIS compliance personnel, was responsible for creating the firm's initial Form ADV Part I. Peter reviewed legal and other research regarding the form's requirements, received input from Madoff, revised and circulated many draft versions of the form, and caused the final version to be filed with the Commission on or about August 25, 2006.

47.     In addition to initial registration filings with the Commission, investment advisers are required to file amendments to Forms ADV Part I at least annually, and more frequently if significant changes occur during an interim period.

48.     Investment advisers also are required to distribute additional information to clients, including at least the information required by Form ADV Part II.  Pursuant to applicable federal securities laws, a copy of the current Form ADV Part II is required to be maintained at the adviser's place of business, which form is deemed filed with the Commission.

49.     Working with Madoff, Peter and his compliance staff created amendments to Form ADV Part I and caused the amended forms to be filed with the Commission on or about January 24, 2007, March 8, 2007, and January 1, 2008.  Peter and his compliance staff also created Forms ADV Part II with input from Madoff.  All of these documents – BMIS's initial Form ADV Part I, amendments to Form ADV Part I, and several versions of Form ADV Part II – contained multiple representations that Peter knew, or recklessly disregarded, were false.  Madoff signed the Forms ADV.

**B.     Misrepresentations**

50.     <u>Number of Clients and Assets Under Management</u> - BMIS's initial Form ADV Part I and subsequent amendments reported that the firm had 23 accounts with assets under management ranging from $11.7 billion in 2006 to $17.1 billion in 2008.  Peter knew that the number of accounts under management was drastically understated, as he was aware of a great number of accounts that should have been disclosed in the Form ADV but that were not included in the list of 23.  These included: (1) hundreds of individual retirement accounts; (2) Peter's own accounts, from which he withdrew millions of dollars; (3) accounts in the names of his immediate family members which had a cumulative purported value in the millions of dollars as of November 30, 2008; and (4) at least eleven accounts for which Peter acted as trustee.  Peter also knew, or recklessly

disregarded, that the reported $11.7 billion – $17.1 billion of assets under management corresponded with the 23 clients disclosed in the Form ADV, and that this figure had no connection with the actual or purported balances of the approximately 4000 accounts BMIS had under management at the time.

51.     <u>No Solicitation</u> - BMIS's Forms ADV Parts I and II stated that the firm did not, "directly or indirectly, compensate any person for client referrals." This was also false. BMIS regularly paid referral fees to several entities and individuals, including Cohmad Securities Corporation ("Cohmad") and Robert Jaffe. Peter personally owned 9% of Cohmad, and Madoff owned another 15%. Peter therefore knew of, or recklessly disregarded, monthly payments of referral fees to Cohmad amounting to more than $100 million over time.

52.     <u>Confirmation of Madoff's Review of Account Activity</u> - BMIS's Forms ADV Part II described Madoff's review of trades in customer/client accounts. "A weekly review is performed by Bernard L. Madoff regardless of any activity in the account. The CCO is responsible for ensuring that these reviews are being performed and shall review on an annual basis the adequacy of such procedures." Contrary to this representation, Peter, the CCO, never ensured these reviews were performed and never reviewed the adequacy of such procedures.

53.     <u>Types of Clients</u> - BMIS's Forms ADV Part II represented that the firm's "advisory services are available only to institutional and high net worth clients." The firm's Forms ADV Part I made a similar representation. Peter knew this was not true because he knew that many of the hundreds of retirement accounts that were not disclosed on the Forms ADV belonged to individuals who were not "high net worth clients."

54.  <u>Peter's Review of Employees' Personal Trades</u> – With respect to employee trades and securities holdings, BMIS's Forms ADV Part II stated that the "[a]dviser's CCO reviews all personal securities trading to ensure the Code [of Conduct] and its restrictions have been adhered to. ... The CCO reviews monthly and annually holdings reports to ensure pre-approvals were obtained and to identify potential conflicts of interest." Peter did not perform any such reviews of activity in employees' BMIS accounts or review any pre-approvals for such activity. Had Peter done so, he likely would have learned that trades in employees' BMIS accounts were almost always backdated by days or weeks, and often by months or years, and may well have discovered that the trades were never even executed.

55.  <u>Peter as CCO of the IA Operations</u> - The Forms ADV Parts I and II identify Peter as BMIS's CCO. This was false insofar as Peter did not function as a CCO, and did not exercise any compliance or other authority, over the IA Operations.

56.  Madoff and Peter made these misrepresentations in order to create the impression that the IA Operations were limited in scope, had a relatively small number of financially-savvy clients, and was overseen by experienced professionals who did their jobs – all of which would, they hoped, decrease the likelihood of intense scrutiny from investors and regulators.

**V.    Peter Assisted in Making Misrepresentations in<br>       <u>BMIS's Broker-Dealer Registration Application.</u>**

57.  BMIS registered with the Commission as a broker-dealer by filing a registration application in 1960. Pursuant to Rule 15b3-1 under the Exchange Act, the firm was required to, and did, file amendments to its application on Form BD as needed to update the form and make it accurate.

58.   All of BMIS's Forms BD that are currently available through FINRA's online registration and licensing system (*i.e.*, all Forms BD that BMIS filed since 1999) were false because they stated that BMIS had only two "types of business." Specifically, such forms represented that BMIS was a "[b]roker or dealer making inter-dealer markets in corporate securities over-the-counter," and "[t]rad[ed] securities for own account;" in other words, the forms only disclosed BMIS's MM & PT Operations. The Forms BD were false and misleading in that they did not disclose the IA Operations in any way.

59.   Peter was the authorized signatory on several such amended Forms BD filed with the Commission, including forms filed in January 2001, March 2007, December 2007, and September 2008.

## VI.   Peter's Attempt to Distribute Ponzi Scheme Proceeds to Family and Friends as the Fraud was Collapsing in December 2008

60.   In the final days of the fraud, the money available to meet investor redemptions had dwindled to a few hundred million dollars because investor redemption requests began to greatly exceed new deposits. In early December 2008, Madoff told Peter that he, Madoff, did not have the means to pay investor redemptions. Madoff, Peter and Frank DiPascali then discussed using what was left of the investors' funds to liquidate the accounts of family, friends and favored employees.

61.   As part of this effort, DiPascali and others created a list of customer/clients and their approximate account balances. Madoff, Peter, DiPascali and others then indicated on this list which accounts should be liquidated before the fraud collapsed. Based on this list, Peter and others caused checks totaling more than $300 million to be prepared to liquidate the selected accounts. However, Madoff was arrested and the checks were seized before they could be distributed.

62.    Meanwhile, on December 10, 2008, after Madoff told Peter there were not enough funds to meet redemption requests received from customer/clients, Peter personally withdrew $200,000 from BMIS's operating bank account.

## VII.    Other Misconduct by Peter Madoff

63.    The Commission's staff performed an examination of BMIS in 2005. Examiners held a meeting attended by, among others, Madoff and Peter. During the meeting, one of the examiners asked Madoff directly if BMIS managed money for investors. Madoff falsely responded that BMIS did not do so. Peter did not speak up, and allowed the examiners to be misled.

64.    During the same examination, examiners requested copies of all BMIS emails that met certain criteria. BMIS employees gathered the responsive emails. Before producing the documents, however, Madoff, Peter and other BMIS employees looked through the emails and decided to destroy some of the materials instead of producing them.

## VIII.   Peter's Ill-Gotten Gains

65.    Peter received ill-gotten gains from BMIS. For example, Peter benefited from fake trades in his own BMIS advisory accounts. In 2002, he "earned" approximately $8.75 million from a fake trade in Microsoft stock. The backdating of this trade was obvious. Peter's account statements reported a purchase of Microsoft stock in December 2000 and a sale in January 2002. However, Annette Bongiorno (a BMIS employee who for decades created fake account statements that were delivered to the Ponzi scheme victims and who has been charged by the Commission in a related case) did not create the trade or input either the buy or the sale into BMIS's computer system, or even open the

account in which the trades supposedly took place, until March 2002. Proceeds from this purported trade were wired from the main bank account used in the Ponzi scheme (the "Ponzi Scheme Bank Account") to Peter's personal account.

66.      Similarly, in March 2005, Peter withdrew millions of dollars from his BMIS advisory account; the funds again were wired to Peter's personal account from the Ponzi Scheme Bank Account. This withdrawal left a large debit (*i.e.*, negative) balance in Peter's advisory account. Months later, in September 2005, Bongiorno created a backdated trade and entered it into BMIS's computer system to reflect a purchase of Apple stock in January 2004 and a sale in March 2005, which "earned" over $8 million and brought Peter's account back into a credit (*i.e.*, positive) balance. These "trades" should have put Peter on notice, as CCO, that there were serious compliance failures regarding trading practices in the IA Operations.

67.      Peter also received over $20 million in salary and bonuses since 2001, over $15.7 million in sham loans from BMIS that were "forgiven" and never repaid, and an additional $7.7 million that was wired directly to him out of BMIS's Ponzi Scheme Bank Account. Peter's wife also had a BMIS advisory account with a purported balance of over $8 million as of November 30, 2008. Peter used these proceeds of the fraud to fund a luxurious lifestyle for decades, including the purchase of multi-million dollar homes in Manhattan and Florida and luxury automobiles.

68.      In addition, Peter used a BMIS corporate credit card to pay approximately $175,000 in personal expenses, including expensive clothes and personal and family vacations. Peter did not report the personal nature of these expenses to BMIS so that the

firm could accurately reflect them in its books and records and treat the payments as compensation for tax purposes.

69.     Finally, beginning in or about 1996, Peter arranged for his wife to be paid $100,000 - $160,000 per year in so-called salary, even though she did not work in any capacity for BMIS.  Peter knew, or recklessly disregarded, that these amounts were falsely recorded in BMIS's books and records as compensation expense when, in fact, the payments were not paid to compensate Peter's wife for employment or any other legitimate services.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Antifraud violations)

70.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

71.     Defendant, in connection with the purchase and sale of securities, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails and/or wires, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon investors.

72.     By reason of the activities described herein, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5
### (Antifraud Violations)

73.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

74.     Madoff and BMIS, in connection with the purchase and sale of securities, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails and/or wires, employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which operated as a fraud and a deceit upon investors.

75.     By reason of the activities described above, Madoff and BMIS violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

76.     Defendant knowingly provided substantial assistance to Madoff and BMIS in committing such violations.

77.     By reason of the activities described herein, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted Madoff's and BMIS's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

**THIRD CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Sections
206(1) and 206(2) of the Advisers Act
(Fraud upon Advisory Clients and Breach of
Fiduciary Duty by Investment Adviser)**

78.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

79.     Madoff and BMIS at all relevant times were investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], and BMIS was registered with Commission as an investment adviser from on or about August 25, 2006 through at least December 2008.

80.     Madoff and BMIS, directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]: (a) employed devices, schemes, and artifices to defraud a client or prospective client; or (b) engaged in acts, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

81.     As alleged in the paragraphs above, Madoff and BMIS violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

82.     Defendant knowingly provided substantial assistance to Madoff and BMIS in committing such violations.

83.     By reason of the activities described herein, and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Defendant aided and abetted Madoff's and BMIS's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 15(c) of the Exchange Act and Rule 10b-3
### (Fraud Upon Customers by Broker-Dealer)

84.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

85.     At all times relevant to the allegations herein, BMIS was a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)], and was registered with the Commission as such.

86.     BMIS, while a broker, by engaging in the conduct described herein, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities (other than commercial paper, bankers' acceptances or commercial bills) otherwise than on a national securities exchange of which BMIS was a member, by means of manipulative, deceptive, or other fraudulent devices or contrivances.

87.     As described in the paragraphs above, BMIS violated Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

88.     Defendant knowingly provided substantial assistance to BMIS in committing such violations.

89.     By reason of the activities described herein, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted BMIS's violations of Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

## FIFTH CLAIM FOR RELIEF

### Violations of
### Section 207 of the Advisers Act
### (Antifraud violations)

90.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

91.     At all relevant times to the allegations herein, BMIS was an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], and was registered with Commission as an investment adviser from on or about August 2006 through at least December 2008.

92.     Defendant willfully made untrue statements of material fact in Forms ADV that Defendant caused BMIS to file with the Commission, or willfully omitted to state in such Forms ADV a material fact which is required to be stated therein.

93.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 207 of the Advisers Act
### (Antifraud violations)

94.     Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

95.     At all relevant times to the allegations herein, BMIS and Madoff were investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], and BMIS was registered with Commission as an investment adviser from on or about August 2006 through at least December 2008.

96.     BMIS and Madoff willfully made untrue statements of material fact in BMIS's Forms ADV that it filed with the Commission, or willfully omitted to state in such Forms ADV a material fact which was required to be stated therein.

97.     By reason of the foregoing, BMIS and Madoff violated Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

98.     Defendant knowingly provided substantial assistance to Madoff and BMIS in committing such violations.

99.     By reason of the activities described herein, and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Defendant aided and abetted Madoff's and BMIS's violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 15(b)(1) of the Exchange Act and Rule 15b3-1
### (False Forms BD filed by a Broker-Dealer)

100.    Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

101.    At all times relevant to the allegations herein, BMIS was a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)], and was registered with the Commission as such.

102.    As alleged herein, BMIS willfully made untrue statements of material fact in Forms BD that it filed with the Commission, or willfully omitted to state in such Forms BD a material fact which was required to be stated therein.

103.    By reason of the foregoing, BMIS violated Section 15(b)(1) of the Exchange Act [15 U.S.C. § 78o(b)(1)] and Rule 15b3-1 thereunder [17 C.F.R. § 240.15b3-1].

104.    Defendant knowingly provided substantial assistance to BMIS in committing such violations.

105.    By reason of the activities described herein, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant aided and abetted BMIS's violations of Section 15(b)(1) of the Exchange Act [15 U.S.C. § 78o(b)(1)] and Rule 15b3-1 thereunder [17 C.F.R. § 240.15b3-1].

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 204
### of the Advisers Act and Rule 204-2
### (Adviser Books and Records Violations)

106.    Paragraphs 1 through 69 are realleged and incorporated by reference as if set forth fully herein.

107.    At all relevant times to the allegations herein, BMIS was an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], and was registered with Commission as an investment adviser from on or about August 2006 through at least December 2008.

108.    As alleged herein, BMIS failed to make and keep certain books and records true, current and accurate.  BMIS, among other things, manufactured and maintained ledgers, journals and other records omitting, misstating and mischaracterizing material transactions, assets, liabilities, income, expenses, and capital accounts.  BMIS also created and maintained false Forms ADV Part II, which were provided to certain clients, and

created and maintained false policies and procedures and records documenting BMIS's

annual review of such policies and procedures.

109.   By reason of the foregoing, BMIS violated Section 204 of the Advisers Act

[15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

110.   Defendant knowingly provided substantial assistance to BMIS in

committing such violations.

111.   By reason of the activities described herein, and pursuant to Section 209(d)

of the Advisers Act [15 U.S.C. § 80b-9(d)], Defendant aided and abetted BMIS's

violations of Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2

thereunder [17 C.F.R. § 275.204-2].

**NINTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Section 17(a)**
**of the Exchange Act and Rule 17a-3**
**(Broker-Dealer Books and Records Violations)**

112.   Paragraphs 1 through 69 are realleged and incorporated by reference as if

set forth fully herein.

113.   At all times relevant to the allegations herein, BMIS was a broker within

the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)], and was

registered with the Commission as such.

114.   As a registered broker-dealer, BMIS was required to make and keep certain

books and records current and accurate pursuant to Section 17(a) of the Exchange Act [15

U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

115.   As alleged above, BMIS failed to make and keep certain books and records

current and accurate.  BMIS, among other things, manufactured and maintained ledgers,

journals and other records omitting, misstating and mischaracterizing material

transactions, assets, liabilities, income, expenses, and capital accounts.

116.   As a result, BMIS violated Section 17(a) of the Exchange Act [15 U.S.C. §

78q(a)] and Rule 17a-3 promulgated thereunder [17 C.F.R. § 240.17a-3].

117.   Defendant knowingly provided substantial assistance to BMIS in

committing such violations.

118.   By reason of the foregoing, and pursuant to Section 20(e) of the Exchange

Act [15 U.S.C. § 78t(e)], the Defendant aided and abetted BMIS's violations of Section

17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. §

240.17a-3].

### TENTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 206(4)
of the Advisers Act and Rule 206(4)-7
(Implementation and Review of Adviser Policies and Procedures)**

119.   Paragraphs 1 through 69 are realleged and incorporated by reference as if

set forth fully herein.

120.   At all relevant times to the allegations herein, BMIS was an investment

adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-

2(11)], and was registered with the Commission as an investment adviser from on or about

August 2006 through at least December 2008.

121.   As alleged herein, BMIS failed to (a) implement written policies and

procedures reasonably designed to prevent violation by BMIS and its supervised persons

of the Advisers Act and the rules thereunder; (b) review, no less than annually, the

adequacy of such policies and procedures and the effectiveness of their implementation;

and (c) designate an individual who was a supervised person as responsible for administering such policies and procedures.

122. By reason of the foregoing, BMIS violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

123. Defendant knowingly provided substantial assistance to BMIS in committing such violations.

124. By reason of the foregoing, Defendant aided and abetted BMIS's violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment against the Defendant granting the following relief:

### I.

Finding that the Defendant violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### IV.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Sections 15(c) of the Exchange Act [15 U.S.C. § 78o(c)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

### V.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

### VI.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Sections 15(b)(1) of the

Exchange Act [15 U.S.C. § 78o(b)(1)] and Rule 15b-3 thereunder [17 C.F.R. § 240.15b3-1].

## VII.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

## VIII.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Sections 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 promulgated thereunder [17 C.F.R. § 240.17a-3].

## IX.

Permanently restraining and enjoining the Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing or aiding and abetting future violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

## X.

Directing the Defendant to disgorge her ill-gotten gains, plus prejudgment interest thereon.

## XI.

Directing the Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9].

## XII.

Granting such other and further relief as this Court seems just and proper.

Dated: New York, New York
     June 28, 2012

SECURITIES AND EXCHANGE COMMISSION

By: _____
             Andrew M. Calamari
Acting Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281-1022
(212) 336-1100

Of Counsel:
Robert J. Burson *(Not admitted in New York)*
Alexander M. Vasilescu
Aaron P. Arnzen
Kristine M. Zaleskas